UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

CASE NO. 5:20-CV-384-KKC

MERCEDES CLEM, PLAINTIFF,

v.  **MEMORANDUM OPINION AND ORDER**

OFFICER ZACHARIAH ZERBEE, *et al.*, DEFENDANTS.

\* \* \* \* \* \* \* \* \*

This matter is before the Court on the Motion for Summary Judgment (DE 57) of the Defendants, the City of Cynthiana, Kentucky (the "City") and Officer Zachariah Zerbee ("Zerbee"), a police officer for the City who is sued in his individual and official capacities. For the following reasons, the Court will grant the motion.

**I.   FACTS.**

   **A.   Arrest by Zerbee.**

On September 15, 2019, Zerbee was contacted by an Assistant Commonwealth's Attorney, Michael Laws, and was informed of a drug trafficking conspiracy involving an inmate in the Bourbon County Regional Detention Center and several individuals outside of the jail, including plaintiff Mercedes Clem ("Clem"). Zerbee was also informed that Clem had an outstanding warrant for her arrest for violating her terms of parole. This was not the first time that Zerbee had heard of Clem; he had encountered her on several prior occasions in response to service calls. Laws provided Zerbee with a description of the vehicle used in the drug trafficking scheme, as well as audio recordings of several jail phone calls. One such recording had Clem advising an inmate, James "Jimmy" Slade, that she had purchased drugs and agreed to purchase more drugs for Slade. Zerbee listened to these recordings before arresting Clem later that night.

1

Shortly after midnight on September 16, 2019, Cynthiana Police Department (CPD) Officer O.C. Jones spotted the vehicle described by Laws and performed a traffic stop at a gas station. When Zerbee arrived at the scene, he approached the driver's side door, asked the driver what her name was, and instructed her to roll down the back driver's side passenger window where Clem was sitting. He then instructed Clem to exit the vehicle and immediately placed her in handcuffs. Clem stated that she was aware of the active arrest warrant and explained that she had fled from a halfway house in Louisville because of a positive drug test. All of Zerbee's interactions with Clem throughout the night were captured on his bodycam, which recorded continuously for a period of nearly four (4) hours.

Once Clem had been arrested, Zerbee escorted her to his cruiser to conduct a pat-down search incident to the arrest. Clem was dressed in a t-shirt and shorts, and she wore a bra and panties as well as a menstrual pad underneath. Deputy Elon Bear observed the search, but testified that he could not see where Zerbee's hands were during the search due to the dark. The search lasted nearly 20 seconds while Zerbee, wearing plastic gloves, felt along Clem's "back and front waistline, pubic region, chest[,] and back." (DE 57-1 at 4.) Clem alleges that Zerbee's hand "covered my vagina, basically" and "just grabbed my vagina, like between my legs." (*Id.*) She specified that his finger grazed her "bikini line," which she defined as "the side of your vagina and leg meet, like the crease, like where panties stop, like around your leg at the edge of your panties." (*Id.* at 5.) During the search, Zerbee asked her "Long time?", which Clem claims that she interpreted as him asking whether it had been a long time since she had been touched sexually. Zerbee claims that he asked that question because it had been a long time since they had encountered each other. (*Id.*) Clem claims that Zerbee searched the female driver "much differently than [her], by not focusing on the vagina." (DE 58-1 at 4.)

While Clem was in the back of Zerbee's police cruiser at the gas station, Zerbee observed Clem shaking and sweating. (DE 57-1 at 5.) Clem testified that he offered to "make the charges

2

disappear" if Clem would "help him out," which she understood to be a request for sexual favors. (*Id.* at 6.) Zerbee notes that this interaction was not caught on his bodycam footage, which recorded all of their interactions. (*Id.*)

### B. Hospital Visit

From the gas station, Zerbee transported Clem to Harrison Memorial Hospital and "presented her to the registration desk for 'clearance.'" (*Id.* at 7.) He informed Clem that this was because he had reason to believe she had recently used drugs and required medical clearance. (*Id.*) They were taken to an exam room, where they were met by two female members of the hospital staff. Zerbee warned Clem about hidden contraband potentially leading to further criminal charges, then left the exam room and shut a curtain for privacy. (*Id.* at 8.) Told by Zerbee to "search for drugs," the hospital staff ordered Clem to remove her clothing for a strip search. (DE 58-1 at 5.) This search took approximately 51 seconds to complete. (DE 57-1 at 8–9.) By the time Zerbee re-entered the room, Clem was fully clothed on the hospital bed. (*Id.* at 9.)

During the strip search, Clem claims that one nurse "took and examined [her] menstrual pad." (DE 58-1 at 5.) She further claims that, upon Zerbee's return, they spoke about her sexual activity—including the number of men that she had been with sexually and other statements "about a man's penis and her drug usage." (*Id.* at 6.) She was then transported to Harrison County Jailer's Officer and later delivered to the Bourbon County Regional Detention Center. She pleaded guilty to and was convicted of five criminal charges, including: (1) trafficking in a controlled substance; (2) conspiracy to traffic in a controlled substance (methamphetamine); (3) conspiracy to traffic in a controlled substance (buprenorphine); (4) conspiracy to promote contraband; and (5) possession of drug paraphernalia.

### C. Claims.

Following the Court's partial grant of motions to dismiss, Clem asserts claims under 42

3

U.S.C. § 1983 against both defendants. In Count I, she asserts that the City violated her Fourth Amendment rights by maintaining a strip search policy used by the CPD. (DE 17 at 11–12.) In Count IV, she asserts that Zerbee violated her Fourth Amendment rights by showing "deliberate indifference to Plaintiff's right to privacy, her right to personal integrity, her right to be free from unwanted physical contact, her right to be free from improper unreasonable searches and seizures, her right to be free from unwanted intrusion upon her person, her right to be free from physical assault and battery, her right to be free from excessive force, her right to be free from unwanted sexual contact, and her right to substantive and procedural due process." (*Id.* at 14–15.) Finally, in Count V, she asserts that the City and Zerbee conspired to violate her constitutional rights by conducting the strip search at issue. (*Id.* at 15–16.)

The City and Zerbee have moved for summary judgment on each of Clem's remaining claims. They argue that Zerbee did not violate the Fourth Amendment and/or is entitled to qualified immunity. (DE 57-1 at 9.) They also argue that the conspiracy claim fails because Clem did not develop any evidence that establishes a plan between the City and Zerbee to conduct strip searches of arrestees. (*Id.* at 22.) Finally, they argue that Clem was unable to establish that the City maintained a policy or practice to conduct strip searches or, in the alternative, that such a policy would not be unconstitutional. (*Id.* at 23.) Clem filed a timely response to the motion for summary judgment, and the Defendants filed a timely reply. (DE 58; DE 60.)

## II.    STANDARD ON SUMMARY JUDGMENT.

Under Fed. R. Civ. P. 56, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The moving party bears the initial responsibility of "informing the district court of the

4

basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 322–25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In considering a motion for summary judgment, the court must view the facts and draw all inferences therefrom in a light most favorable to the nonmoving party. *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). The moving party must show conclusively that there is no genuine issue of material fact. *Id.* However, at the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter. *Wiley v. U.S.*, 20 F.3d 222, 226 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249). The Court is not to judge the evidence or make findings of fact. *60 Ivy Street Corp.,* 822 F.2d at 1435–36. The

5

purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F.Supp.2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

### III. QUALIFIED IMMUNITY.

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Farm Labor Organizing Comm. v. Ohio St. Highway Patrol*, 308 F.3d 523, 532 (6th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity entitles its possessor to '*immunity from suit* rather than a mere defense to liability." *Daugherty v. Campbell*, 935 F.2d 780, 783 (6th Cir. 1991) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

Courts employ a three-step inquiry for determining whether qualified immunity is proper:

> *First*, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. *Second*, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. *Third*, we determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (emphasis added) (quotation omitted). If the answer to all three questions is "yes," qualified immunity is not proper.

#### A. Unlawful Arrest and Search at the Gas Station

Clem argues that both the arrest and search conducted by Zerbee at the gas station were unlawful because he lacked probable cause to arrest her. "In order for a plaintiff to prevail

6

on a theory of wrongful arrest under § 1983, he [or she] must prove that the police lacked probable cause." *Frodge v. City of Newport*, 501 F. App'x 519, 526 (6th Cir. 2012). "A plaintiff's Fourth Amendment rights are not violated if an officer does not have an arrest warrant so long as 'probable cause exists for the arresting officer's belief that a suspect has violated or is violating the law.'" *Id.* (quoting *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988)). In evaluating probable cause, the Court must look at the totality of the circumstances, from the perspective of a reasonable officer on the scene. *Id.* "Probable cause 'means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Id.* (quoting *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1010–11 (6th Cir. 1999)). Probable cause is a flexible, common-sense inquiry, and it "requires only 'a "fair probability" that the individual to be arrested has either committed or intends to commit a crime.'" *Id.* (quoting *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) (internal citation omitted)). "Mere speculation that a crime occurred," however, "is insufficient to establish probable cause." *Id.* at 526–27.

Here, Zerbee had probable cause to arrest Clem because: (1) he knew that a warrant had been issued for her arrest; and (2) he understood that Clem had been involved in drug trafficking. The Defendants correctly point out that there "is no dispute that [the warrant] was issued prior to [Clem's] arrest and that Zerbee was aware of the warrant prior to placing Ms. Clem under arrest." (DE 57-1 at 11.) In her response, Clem appears to argue that learning about the arrest warrant from Assistant Commonwealth's Attorney Laws was somehow detrimental to the validity of the arrest. (DE 58-1 at 15–16.) She then argues that there was no probable cause and, as a result, the subsequent search was unconstitutional. The Court cannot agree with such a claim.

The totality of the circumstances shows that a reasonable officer would believe that

Clem had committed, was committing, or intended to commit drug trafficking crimes. Zerbee had been provided with information regarding Clem's drug trafficking activities from Laws—information that Zerbee had no reason to believe was unreliable. He had listened to phone calls between Clem and an inmate, Slade, in which she spoke about purchasing drugs and agreed to purchase more. He later found Clem in the vehicle that was involved in the drug trafficking activities, according to Laws. Further, Zerbee noted that Clem was "shaking and sweating" during the stop despite the mild temperature. (DE 57-1 at 5.) Regardless of whether Zerbee confirmed for himself that an arrest warrant for Clem existed in the CPD's system, the facts and circumstances demonstrate that Zerbee had probable cause to arrest Clem for suspected drug trafficking. Accordingly, viewing the facts in the light most favorable to the plaintiff, the Court finds that arresting Clem was not a constitutional violation and Zerbee is entitled to qualified immunity on this claim.

For the same reasons, Zerbee is also entitled to qualified immunity on the claim alleging that the subsequent search was not authorized as a search incident to arrest. "When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his [or her] escape . . . [or] to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction." *Chimel v. California*, 395 U.S. 752, 763 (1969). The Sixth Circuit has explained that the search-incident-to-arrest doctrine permits the arresting officer to "conduct a full search of an arrestee's person incident to a lawful custodial arrest." *United States v. Montgomery*, 377 F.3d 582, 586 (6th Cir. 2004). However, there is a prerequisite that the arrest be supported by probable cause. *United States v. Robinson*, 414 U.S. 218, 235 (1973).

The aforementioned reasons show that Zerbee had probable cause to arrest Clem for suspected drug trafficking. This probable cause led to a lawful arrest, which in turn provided

8

Zerbee with the authority to search Clem's person for weapons or instruments of the crime. Accordingly, viewing the facts in the light most favorable to the plaintiff, the Court finds that conducting Clem's initial search was not a constitutional violation and Zerbee is entitled to qualified immunity on this claim.

### B. Excessive Force

Clem argues that Zerbee used excessive force during his search by allegedly groping her. The Court must first consider whether the facts, when taken in the light most favorable to the Plaintiff, demonstrate the occurrence of a constitutional violation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry."). Whether Zerbee violated Clem's right to be free from excessive force is a question that must be analyzed under an "objective reasonableness" standard. *Greene v. Barber*, 310 F.3d 889, 898 (6th Cir. 2002) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). "This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002). The Court must consider:

> the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting or attempting to evade arrest by flight.

*Graham*, 490 U.S. at 396.

The right to make an arrest carries with it the right to use "'some degree of physical coercion or threat thereof . . . .'" *Graham*, 490 U.S. at 396. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id*. (citation and quotations omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second

9

judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id*.

If the Court determines that the officers violated Clem's constitutional right to be free from excessive force, the second step of the qualified immunity inquiry "requires a determination that the right was so clearly established that a reasonable official would understand that the particular conduct at issue violated that right." *Crockett v. Cumberland College*, 316 F.3d 571, 579 (6th Cir. 2003). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Greene*, 310 F.3d at 894 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

A police officer may be entitled to qualified immunity even though he has violated the plaintiff's rights. *Greene*, 310 F.3d at 894. The immunity inquiry should acknowledge that "reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier*, 533 U.S. at 205. "If the officer's mistake as to what the law requires is reasonable, . . . the officer is entitled to the immunity defense." *Id*.

"In inquiring whether a constitutional right is clearly established, we must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002). "[A]n action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers*, 319 F.3d at 848.

"[T]he right to be free from excessive force is a clearly established Fourth Amendment right." *Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001). The Sixth Circuit has articulated a

10

clearly established right to be free from specific types of non-deadly excessive force, such as handcuffing an individual too tightly. *See Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993). The Sixth Circuit has also consistently held that various types of force applied after the subduing of a suspect are unreasonable and a violation of a clearly established right. *See, e.g.*, *Phelps v.* Coy, 286 F.3d 295, 301 (6th Cir. 2002) ("[T]here was simply no governmental interest in continuing to beat Phelps after he had been neutralized, nor could a reasonable officer have thought there was."); *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988) ("[A] totally gratuitous blow with a policeman's nightstick may cross the constitutional line.").

Taking all of Clem's allegations as true, the Court finds that she has not presented sufficient evidence that the particular type of physical force exerted against her was objectively unreasonable. Clem's deposition testimony does not support the express allegation that "Zerbee attempted to digitally penetrate [Clem's] vagina cavity but was unsuccessful . . . ." (DE 17 at 5.) When asked "Did [Zerbee] actually try to stick a finger into your vagina?" she responded with "I had shorts on so, like, it was — yes, basically yes." (DE 57-6 at 14.) She proceeds to clarify that Zerbee's hands never went underneath her clothes during the search. (*Id.*) When asked whether he tried to insert a finger into her vagina from the outside of her clothes, she ultimately testified: "Like his hand or like the fingers. My shorts were short, so his finger like grazed—like I could feel it on my leg and like your bikini line. He got to the bikini line. Like I could feel it graze my—his fingers grazed my bikini line." (*Id.*) She later testified that the "bikini line" meant where "the side of your vagina and your leg meet, like the crease, like where your panties stop, like around your leg at the edge of your panties." (*Id.* at 36.)

Clem's initial answer of "basically yes" to the question about Zerbee allegedly inserting his fingers into her vagina is ambiguous. Under oath, her allegation about Zerbee's conduct during the search was ultimately reduced to a "grazing" of the bikini line. Under the qualified immunity analysis, the Court must ask itself whether the facts, when taken in the light most

11

favorable to the Plaintiffs, demonstrate the occurrence of a constitutional violation. This is judged by a reasonableness standard. The Court cannot operate under the assumption that Zerbee attempted to digitally insert his fingers into her vagina when Clem failed to affirmatively state that under oath. While Zerbee's comment of "Long time?" may have been inappropriate, particularly from Clem's perspective, the Court nonetheless finds that his search of Clem's groin area did not violate Clem's constitutional rights.

As previously discussed, an arresting officer may "conduct a full search of an arrestee's person incident to a lawful custodial arrest." *United States v. Montgomery*, 377 F.3d 582, 586 (6th Cir. 2004). Numerous cases within this circuit have found that searching the groin area is valid when executing a search incident to arrest. *See United States v. Smith*, 549 F.3d 355, 360 (6th Cir. 2008) (noting that the arresting officer knew that drug traffickers commonly hide contraband in the crotch area); *United States v. Wright*, 16 F.3d 1429, 1432 (6th Cir. 1994) (upholding a search in which an officer removed a plastic bag of crack cocaine from the suspect's crotch area); *United States v. McCants*, 2:22-CR-20320-TGB-APP, 2023 WL 4068565, at *2 (E.D. Mich. June 16, 2023) (upholding a search in which an officer detected foreign objects in the suspect's groin area).

Even if the Court found that this grazing of the bikini line was a constitutional violation, it is not clear whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Clem's clothes were not removed, and Zerbee kept his hand on the exterior at all times. A reasonable person could easily believe that they were entitled to search the suspect's entire body incident to arrest, in order to confirm that the suspect was not carrying more contraband. Accordingly, the Court finds that Zerbee is entitled to qualified immunity on this claim.

  **C.** **Unlawful Search at the Hospital**

Clem also argues that her subsequent search at the hospital violated her constitutional

rights. "To successfully state a claim under 42 U.S.C. § 1983, a plaintiff must identify a right secured by the United States Constitution and the deprivation of that right **by a person acting under color of state law**." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). Defendants present two arguments on this particular claim: (1) that Clem failed to establish that the hospital personnel were acting under color of state law when instructing her to remove her clothing during the search; and (2) the strip search was nonetheless constitutional or it was not clearly established that the strip search was unconstitutional. The Court analyzes these arguments in turn.

### 1. Acting Under Color of State Law

It is clear from the record that the hospital staff who conducted the strip search are not state actors. In order to succeed on her claim, Clem must show that the hospital staff were acting under color of state law when conducting the strip search. "There are three tests employed by the courts to determine whether the challenged conduct is fairly attributable to the state: (1) the public function test, (2) the state compulsion test[,] and (3) the symbiotic relationship or nexus test." *Collyer v. Darling*, 98 F.3d 211, 232 (6th Cir. 1996) (citing *Wolotsky v. Huhn*, 960 F.2d 1331 (6th Cir. 1992)). The Court notes that Clem failed to address any of these three tests in her response to the motion for summary judgment.

The public function test "requires that the private entity exercise powers which are traditionally exclusively reserved to the state." *Id.* Here, Clem has provided no evidence that the hospital staff were performing an action traditionally reserved to the state. Further, it is unlikely that granting medical clearance could be considered an action traditionally reserved to the state when the record indicates that the state typically relies on non-state actors, such as Harrison Memorial Hospital in this case, to assess the medical stability of arrestees.

Next, the state compulsion test "requires that a state exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the

13

private actor is deemed to be that of the state." *Id.* The only support that the Court could construe as addressing this point are quotes from Zerbee that Clem brings up in her response. These quotes include "who wants to be the volunteer tonight?" and "sorry girls" when presenting Clem to the hospital staff, and "search for drugs" when asked what the hospital staff were supposed to do. (DE 58-1 at 18.) These quotes fail to establish the "coercive power" or "significant encouragement" necessary to constitute the hospital staff as state actors under this test. Clem does not allege that Zerbee told the hospital staff to conduct a strip search, nor do any of his quotes insinuate that he wanted anything beyond a search for medical clearance. In fact, it was not until Zerbee left the room and the curtain was closed that a member of the medical staff said that they were "doing a strip search[.]" (*Id.*) Clem has failed to present any evidence that Zerbee forced the hospital staff to conduct the strip search.

Finally, the symbiotic relationship test states that "the action of the private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." *Collyer*, 98 F.3d at 232. Under this test, the record presents a plausible argument that there is a sufficiently close nexus between the hospital staff's strip search and Zerbee's challenged conduct. The conversations between Zerbee and the hospital staff could suggest some familiarity with the type of search that Zerbee was looking for—i.e., a strip search. Not only does he apologize when presenting Clem to the hospital staff, Zerbee's lack of specificity in his order to search for drugs could suggest that he knew that the hospital staff would perform a strip search on Clem.

### 2. Constitutionality of the Strip Search

Even if the Court found that the symbiotic relationship test was satisfied in this case, the Court finds that the strip search performed in this case was nonetheless constitutional. The Supreme Court set out a balancing test for reasonableness when considering the

constitutionality of a strip search, stating that the Fourth Amendment "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.*

Here, the CPD followed the Jailer's requirement that anyone who is arrested and is suspected of having used drugs or alcohol within the past 24 hours "must be taken to the hospital for medical clearance prior to being turned over to the Jailer for transport to the detention facility." (DE 57-1 at 6.) This adherence led to Zerbee taking Clem to the hospital prior to the Jailer transporting her to the detention facility. Regardless of what Zerbee intended the hospital staff to do, Clem was strip searched at the hospital. The Court finds that, under *Bell*'s Fourth Amendment balancing test, the strip search was constitutional.

This particular intrusion was limited in scope. The hospital staff did not remove Clem's clothing by force; she complied and removed all of her clothing. Nothing in the record suggests that the hospital staff conducted themselves inappropriately during the search or extended the search for longer than necessary. Nowhere in Clem's deposition does she claim that the hospital staff physically touched her—only that one told her to squat down and cough after she removed her clothing. (DE 57-6 at 28.) Further, the search was conducted by two individuals of the same sex as Clem. (*Id.*) By the time Zerbee entered the room again, Clem was fully clothed. (*Id.* at 29.) At no point does Clem allege that Zerbee was present during the search or that he participated. The entire search at the hospital took place in a private setting and was conducted by medical professionals.

Zerbee also had reasonable justification for having the hospital staff search Clem. As previously discussed, he had probable cause to arrest Clem for suspected drug trafficking. He was made aware of her suspected participation in drug trafficking by Attorney Laws. Laws

15

informed him of phone calls between Clem and an inmate, in which Clem admitted to purchasing drugs and agreed to purchase more *for* the inmate. Laws further provided a description of the vehicle being used in this drug trafficking conspiracy. The Court previously noted that nothing has been alleged that discredits Laws' information or would give Zerbee any reason to doubt its validity at the time. Armed with Clem's own admission to purchasing drugs and plan to purchase more for the inmate, supporting the probability of the suspected drug trafficking conspiracy, Zerbee ultimately found Clem in the very car that was alleged to be operated in furtherance of the conspiracy. It is reasonable for Zerbee to think that Clem could still be concealing drugs somewhere on her person after his initial search.

The Sixth Circuit has emphasized the importance of searching an arrestee when they are about to be ingratiated with the general jail population. *See Dufrin v. Spreen*, 712 F.2d 1084 (6th Cir. 1983) (finding that a pretrial detainee was validly strip-searched when she was ultimately about to come into contact with the general jail population, the search was visual only and conducted by a same-sex attendant, the search was limited in duration and privacy, and there was no claim of offensive behavior during the search). The fact that the CPD had an internal policy of conducting strip searches at the jail is not dispositive of the constitutionality of the search. *See Davis v. Scherer*, 468 U.S. 183 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision."). Accordingly, the Court finds that the strip search conducted in this case was constitutional under the *Bell* balancing test and that Zerbee is entitled to qualified immunity on this claim.

## IV.    UNCONSTITUTIONAL POLICY OR CUSTOM CLAIM

Cities and counties can be found liable under § 1983 only where a policy or custom of the municipality has caused a violation of the plaintiff's constitutional rights. *Thompson v. Ashe*, 250 F.3d 399, 409 (6th Cir. 2001) (citing *Monell v. Department of Social Services*, 436 U.S. 658,

16

690–91 (1978)). Clem asserts that the City has a policy or custom that violates the Fourth Amendment's prohibition against unreasonable searches by using hospital staff to conduct strip searches that its police officers could not perform themselves. This claim cannot survive summary judgment.

"A 'custom' for purposes of *Monell* liability must 'be so permanent and well settled as to constitute a custom or usage with the force of law.'" *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 507 (6th Cir. 1996)(quoting *Monell*, 436 U.S. at 691). "It must reflect a course of action deliberately chosen from among various alternatives." *Id.* "In short, a custom is a legal institution not memorialized by written law." *Id.* In order for *Monell* liability to attach, there must be proof of some policy or custom that can be attributed to an official policymaker. *Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985)(quotations and citation omitted).

Clem has failed to establish any evidence that shows the existence of this policy to use hospital staff to conduct strip searches or that it could be attributed to an official policymaker. She does not take issue with the CPD policy of following the medical clearance requirement, but focuses on the strip search itself. Contrary to what she claims in her response, CPD Chief Eric Kendall specified that the process of obtaining medical clearance does not include being strip searched. (DE 57-7 at 41.) Zerbee made the same claim in his own testimony. (DE 57-2 at 94.)

Clem points to testimony given by paramedic Michelle Mitchell and Sergeant O.C. Jones, Jr. during a disciplinary hearing on Zerbee's conduct, but fails to cite specific portions of the six-hour hearing that she was referencing. The one citation that she provides, referencing testimony from a former CPD chief, is incorrect. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by[] citing to particular parts in the record . . . ." Fed. R. Civ. P. 56(c)(1)(A). Further, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of

17

material fact." *In re Morris,* 260 F.3d 654, 665 (6th Cir. 2001). Clem has failed to cite this disciplinary hearing testimony with particularity. Even if she had cited correctly, the Defendants properly note that the hearing pertained to the allegation that a strip search had been performed at the hospital in violation of CPD policy that those searches only occur at the jail. That contradicts Clem's assertion that the City has a policy or custom of allowing hospital staff to conduct strip searches for its police officers.

Clem's evidence of potential wrongdoing by Zerbee does not support her claim against the City. She cannot base her claim against the City solely on Zerbee's conduct. *Claiborne County*, 103 F.3d at 507. Rather, she must show that the City itself, through its final policymakers, was the wrongdoer because municipalities cannot be held liable under § 1983 for the actions of its employees on a *respondeat superior* theory. *Id.* (citing *Monell,* 436 U.S. at 691). Clem has presented no evidence that the City consciously maintained a custom of submitting individuals to strip searches by hospital staff. Accordingly, her claim against the City must be dismissed.

## V.    CONSPIRACY CLAIM

Under 42 U.S.C. § 1983, Clem alleges a conspiracy between the City and Zerbee to violate the Fourth Amendment's prohibition against unreasonable searches by using hospital staff to conduct strip searches that its police officers could not perform themselves. The Sixth Circuit has explained that a conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." *Marvaso v. Sanchez*, 971 F.3d 599, 606 (6th Cir. 2020) (quoting *Revis v. Meldrum,* 489 F.3d 273, 290 (6th Cir. 2007). "In order to survive dismissal, Plaintiff needed to allege facts that, when accepted as true, would allow a juror to find that (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed in furtherance of the conspiracy that caused the injury." *Id.* (quotations omitted). Further, vague

18

and conclusory allegations unsupported by material facts are not sufficient to maintain a conspiracy claim under § 1983. *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 563 (6th Cir. 2011) (citing *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003)).

The Court agrees that Clem has failed to develop evidence that satisfies any of these three elements. She has not developed evidence that shows a plan between the City and Zerbee to conduct strip searches at the hospital, nor has she shown that the Defendants shared a common objective to deprive her of her constitutional rights. In her response to the motion for summary judgment, Clem does not argue that this conspiracy claim should survive summary judgment—in fact, she does not address this particular claim at all. Accordingly, the § 1983 conspiracy claim against both Defendants must be dismissed.

## VI. CONCLUSION.

For all the above reasons, the Court hereby ORDERS as follows:

1) the Defendants' motion for summary judgment (DE 57) is GRANTED; and

2) the Court will enter a judgment consistent with this opinion.

This March 6, 2024.

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY